Case No. 24-5011 Michael Hill v. United States Department of the Interior et al. Ms. Seilstedt for the appellants, Ms. Bragg for the appellees. Good morning, counsel. Is it Seilstedt? Seilstedt, yes. Okay. Thank you. Thank you. Good morning, your honors. My name is Andrea Seilstedt. I represent the appellants, Michael Hill, who is present in the courtroom today, the Apsallica Allottees Alliance, and other named individual allotment landowners who are also members of the Crow Tribe. I would like to reserve four minutes for rebuttal. The appellants are challenging the Department of Interior's failed implementation of a compact approved by the State of Montana, the Crow Tribe, and the United States that sought to resolve litigation between the three governmental entities. The individual allottees were not parties to the compact but are affected deeply by its terms and its implementation. Under the terms of the compact, the United States agreed to waive the allottees' winter's doctrine water rights and place them within a collective tribal water right. Under the Acts, Sections 410B and E of the Settlement Act, the waivers were to take effect and the terms of the compact become enforceable upon the Secretary of Interior's publication of a statement of findings. That took place on June 22, 2016. Ms. Seilstedt, one of the things I wasn't sure, going through the briefing and the record, is why the winter's rights of these allottees are more valuable than the rights that are afforded under the Act. Given that winter's rights would have to be adjudicated and, you know, in a lengthy process, the Act seems to protect, you know, to give people the same rights that they have or greater. So if you could just explain that to me. I mean, obviously there's some sense in which these winter's rights are understood to be more valuable. Yes, well, I mean, going to the definition of the winter's rights, they are a paramount right that goes back in priority to the date of the reservation's creation under the treaty, which is May 7, 1868, which is critically important in times of shortage. There's other rights that go along with it in terms of rights. They can be expanded. They can't be forfeited due to lack of use or abandonment as can equivalent state law rights and the like. So there's many different parameters that come along with that. And those parameters do not come along with the rights. Correct, correct. So under the terms of the compact and put into place with the legislation, the water is placed, taken, waived by the United States government, who represented the Olatis without their participation or consent. The United States agreed to sign waivers of the individual Olatis winter's doctrine water rights, which would be triggered upon that enforceability date. And then the water of the Olatis went into this collective amount of water that also was shared by the tribe and by other Olatis. And the way of accessing it, this is also critically important in terms of the impacts, the way of accessing that under the terms of the compact and the act was to apply for a permit, which is a defeasible permit, which could be taken away or even argued about as to whether they were going to get this defeasible permit. And most significantly, which underlines our claims also, the permit was to be obtained through details of a tribal water code, which would set out the parameters for application, qualifications, and the like, and also a dispute resolution mechanism if it was denied. And that tribal water code to date has yet been approved by the Secretary. So there's really no way for them to get their water rights. But even if there was a perfect implementation by Department of Interior, there's still an extinguishment of the actual right, followed by the possibility of applying for a permit. There are some other details in the ‑‑ it's very complicated, and this will be one of the things, but there's some other details. I mean, we are a decade plus past the compact and approaching a decade since the statement of findings. Something must be done to be allocating water rights in the meantime. I mean, the Secretary is supposed to do that until there's a water code, right? So folks are getting water rights, have been getting water rights? Well, actually, and this would be something I wanted to emphasize, that we're at the pleading stage, and the case has been dismissed, so not all of these facts have been developed, and we would suggest that the district court erred in that, and we should be remanding it to develop the factual record. But through the Montana Water Court adjudication, the state water right holders effectively have their water rights, their claims submitted and adjudicated, several thousand of them, with a precise amount of water that can be obtained and distributed. The tribal water users, it's not correct, we understand factually, that they are able to get all their water. I mean, if somebody had water that happened to be flowing across their allotment, they might be able to get it. But if they needed it to be brought to them through the irrigation system or other means, it's quite likely that they wouldn't be able to do it. And furthermore, in the course of the Montana Water Court adjudications, which are one of the things that the Department of Interior was supposed to ensure happened before it published a statement of findings, there was never a point where the individual allottee's water right was submitted according to the detail that was supposed to be provided to give an individual recognition of it. The current use list was never prepared. So the non-Indian state law water rights holders have defined rights that were adjudicated, and the pro allottees do not have those equivalent rights defined. So many of them are not able to actually get the water, and they're not even able to figure out how they would go about applying for it. And so they are only able to get it if something was already flowing upon their land that was already working. Ms. Salstead, can I ask you about, so one of your arguments is that the tribal chairman did not have the authority to extend the deadline for the statement of findings. Yes. And so I've looked at the Crow Constitution and the other sources of law that have been cited, and it seems that the tribal chairman under the Constitution has all the sort of authorities we would associate with an executive. The tribal chairman can implement the law, can negotiate with other governments. And so I'm wondering why those constitutional authorities don't include something as sort of ministerial as this, you know, agreeing to moving the deadline. I'm wondering if there are any other sources of law that you can cite. I mean, of course, I'm not an expert in the law of, you know, the Crow tribe, but I'm wondering if there are any other sources of law that you would point to that would limit the tribal chairman's authority. Well, I might push back a little bit on the idea that the extension was simply ministerial, but I do see your point that there has to be an ability for a tribe or any entity to kind of take some kinds of executive actions to take care of things. The question is which things are important to involve the larger decision-making authority of the sovereign entity and which things are purely ministerial. In this case, the extension, because the deadline was so significant of a triggering point, and by then, as I think you have pointed out, lots of years had passed since even to the point of June 22nd, 2016. Many things were not in place by then. The current use list had not been created. The water hadn't been quantified with respect to it. That doesn't go to the authority of the chairman. Okay, well, okay. So going specifically to the authority, I would say, I mean, we cited in the brief to the federal authority that requires Interior to know and to defer to the authority of the tribe. Part of that is to approve the, to know and to, the constitutions of the tribe. The Secretary of Interior actually approved and reviewed the constitution of the Crow tribe. If you look at, I mean, that's really, the constitution of the Crow tribe would be the primary starting point. So, I mean, reading that just from the way I understand, you know, constitutional authorities and executive power, it would seem that the tribal chairman has this authority. Well, the tribal, well, first of all, it's the, the tribal chairman himself has limited, much more limited authority. The part about negotiating for things like mineral rights or water or things like that is delegated to the executive branch to be involved in the negotiation. That part is true. There's four, four government officials that comprise the executive branch. We didn't emphasize that point in the briefs, but that's another point that it's not just the tribal chairman that's making the executive decisions. It's a group of four other people. And in this case, there was only one that came forward. The second part is if you look at the authority of the legislative council in that same document, it's quite clearly laid out as needing to approve the negotiations of the executive branch, which in issues of this nature. And then the third goes to the ratification by the general council. Many tribes do have a more consensus-based form of governance that akin to referendums, but the whole community comes together of matters of importance. And this tribe found the issue of the water compact and the water rights to be of paramount importance. So the other documents that show that and really help interpret the Constitution itself are some of the documents that we submitted, but that the tribal legislature passed either by resolution or by... Resolution, I mean, from what I can tell, you know, looking online and how tribal resolutions are treated under the Crow Constitution, I mean, they're basically just like a, like what we would think of as like a sense of the Congress. They're not binding legal commitments. Are resolutions binding law under the Crow Constitution? Well, the interesting thing, the resolution you're talking about, that 1207 from May 24th, 2012, protesting an earlier decision by the chairman. The thing that's significant about that is it summarizes, it's an interpretation, really, and a good detailed summary of the law of the tribe. The law, is it? I mean, a resolution is not like a statute or binding on anybody, is it? It's not the law and the same thing as the Constitution or like the election code, something like that. Like the ratification vote procedure is modifying the election code. So that is at a level of a law or an amendment to a law. The resolution is different. That's true. But the thing that's significant is it's telling, it's putting the... Okay, so what informs Department of Interior about what any tribe's laws are? They have to figure it out and look at the tribal governing documents that are there. I mean, with all due respect, I think that the Constitution is quite clear on this point. But if it wasn't clear, the resolution reminds Interior, no, this is serious. You have to pay attention to these things. The tribal chairman does not have this authority. So in case there is any doubt, it puts them on notice of the importance of following these provisions of the tribal constitution. And in the last sentence, I mean, one of the sentences, the Crow tribe legislature further gives notice that absolutely no waivers or releases of Crow tribal rights and claims shall be considered unless proposed settlement terms are fully reviewed and deliberated by the Crow legislature and the Crow Tribal General Council. So it is an interpretive issue. It does probably, I'm not sure that it needs to be resolved at the level of appeal, like exactly which branch had the proper governing authority. But I think there's significant... The allegation in the complaint, which is what we go by, is that the tribal chairman lacked authority as one person to do that, that the tribe had been trying to, through its legislature and its exercise of its resolution power, to bring this to the attention of Interior. Also, if you look at the Settlement Act itself, it's quite clear it needed a full referendum vote to start the whole process going. It had to be certified. A better interpretation is that when there was going to be a change, that that was also significant, that the United States needed to look to the tribal governing processes. So going to just a word about the pleading standards, because that's also, that's like the fundamental issue. We, there's lots of things alleged. There was a very detailed complaint that was submitted. The notice pleading standard is what we go by. The things I would point out would be that we look at the factual allegations. We look at, we don't have to match each fact to each element of the legal claim. And we have established, through a very detailed complaint, the provisions for claims under the Administrative Procedure Act, as well as for breach of trust and the three different constitutional claims. So I understand that had there not been an agreement to an extension, so if there had been no extension, and then a statement of findings were not filed, the statute says then the statute goes away, and I guess the compact would necessarily go away, too, because it wouldn't be ratified by the United States. But what is your authority that if an extension were, say, assumed for purposes of this question, mistakenly granted, but there was an extension agreement by the chairman, and the government went forward and then filed the findings on the extended date consistent with the statute, what is the best authority that, because it was mistaken, we go back and the same consequence happens, that is that the statute ceases to exist, the compact ceases to exist, as opposed to good faith mistake, but the statement of findings are there, the trigger point is there, things have gone into motion. This is a sort of legal question. I think the best authority for that, what happens in the event you don't reach the ending, or you made a mistake in the approval process of an extension, is in the Act itself. The Act itself, first of all, if you look at the legislative history of the Act, Tell me what the Act itself says. Well, the main thing is the Act provides exit ramps. The Act wanted these things to be done in order for the elates to get the best recognition of their water rights, and put it on interior to do these series of steps. And it recognized that there are a few things that were essential to be done, and that if they couldn't be done, It said what those seven things were, and there's no dispute that those were done, and that those were done at the time the statement prior to, and so completed by the time the statement of findings of fact were done. So the things that Congress wanted done were done. They were done by the time the statement of findings of fact was filed. And so where is there indication that not even so, because the extension was perhaps mistakenly agreed to, as your argument, let's assume it's true for these purposes, was mistakenly agreed to by the chairman, that now, after the fact, everything falls apart. Well, it had those seven steps, plus the development of the tribal water code, we would pass it. Congress did not say we do not want the statement of findings filed until there's a water code. It just didn't say that in the statute. Well, it did say that the water code had to be completed within three years of the act. It did, but those are separate legal claims when someone is untimely in their actions under a statute. They don't make the whole statutory scheme evaporate the way Congress said would happen if the findings weren't filed absent an extension. Okay, two things about the seven steps. The seven steps, the water court adjudication was completed by the Montana Water Court. We alleged and we would emphasize that the rights of the individual Crow allottees were not adjudicated. So that wasn't completed, actually, with respect to the Crow individual water rights. With respect to your question about, well, let's say everything was done perfectly, I still push back on the tribal water code and whether that needs to be completed by that time frame. But let's pause it, as you suggested, that everything was completed and the only thing wrong was this three-month extension and how that came about. The timing, I guess I'd refer you to that section 415 that talks about the automatic repeal, that Congress, this statute wasn't so written in stone that it's just going to go forward come hell or high water. There was going to be a number of things that had to go into place to make it work. Some of them were the funding issues about the projects, and some of them were about the identification and the quantification of these water rights. And there was a period of time, a rather extensive period of time in which these things could be done. And in the statute, there's three places that allow for kind of like we called it a fail-safe provision or an exit ramp if they weren't done. Some of it had to do with the financing for the Water Act, which there's no guarantee of what's going to happen with that. But with respect to the- The funds were made available as promised at the time the statement findings was made. Yes, but not all of the funds have been appropriated yet. There's that 2030 date that is in the Act that would be another triggering point for nullifying the terms of the Act and the waivers as well. So when you look at the legislative history that was presented to Congress, they were very- It was from the administration. There was high concern about the ability to quantify all those water rights and do all the steps that needed to be done to protect the water rights. Actually, the Department of Interior officials weighed in on that and actually asked that the Act- Congress delay the passing of the Act. Well, Congress didn't delay it. They put the burdens on Interior, and then they did put these exit ramps in the statute. So 415 is one of them. So it's pretty clear Congress wanted things to be done correctly, and they needed to be done correctly. Otherwise, we end up where we are now with an Act where, as we've alleged even with our equal protection claims, state water users have their rights happily adjudicated and can do what they want with them. They can sell their land knowing what they are. And tribal owners can't do that. That's certainly not what Congress wanted. That's certainly not even what the Department of Interior wanted leading into it. And the solution for Congress is to provide that automatic repeal if things couldn't be done. And so we posit that that is, that the statement of findings should be set aside under the Administrative Procedure Act, and then the automatic repeal would be in place. My colleagues have any questions? No. Thank you very much, Counsel. We'll give you a couple of minutes for rebuttal. May it please the Court, I'm Mary Gabrielle Sprague representing the Department of the Interior. The allottees allege failures of implementation. If those are correct, they may well have claims to address those specific failures of implementation. But that is not what this lawsuit is about. This is not what their claims target. The linchpin is trying to leverage the statement of findings to invalidate the entire statute. They believe Congress made a bad deal. They wanted a different deal. But the Section 415, which calls for automatic repeal, simply does not go into effect in this situation because, as Judge pointed out, all seven of those tasks have been completed. You talk about this extension decision as sort of ministerial, and that's often how… The publication of the statement of findings was ministerial. The extension agreement, Your Honor, we think is entitled to an abuse of discretion standard. But it did require discretion in deciding whether to enter into it. And our position on that is there has been no abuse of discretion. You call it ministerial. It hinged on this extension. I'm not sure whose discretion abuses. I don't even know what your abuse of discretion argument is as to agreeing to the extension. Your decision, the Secretary's decision? The Secretary's decision. I mean, the Secretary's… The statute says you've got to have the agreement of the tribe. Correct. Full stop. You have to have the agreement of the tribe. Right. And it does not define who the tribe is in this circumstance. The Settlement Act requires… The Secretary had to act reasonably. Correct. Okay, well, that's not an abuse of discretion standard. That's a reasonableness standard. But I want to get back to, even if the ultimate finding itself, filing of the statement of findings was ministerial, when it would be filed was hinged upon this agreement to an extension. And it seems to me the argument about who could make this decision to extend the time, ordinarily it seems like something that's administrative. But in this case, the type of thing that an executive could do when I say administrative. But in this case, the decision whether to extend the time, to agree to an extension of time or not, was really a decision whether to go forward with this compact or let it die on the vine. Because if they didn't agree to the extension, that's it. The Settlement Act's gone.  It was… The agreement's gone. That's a very substantive decision about whether to go forward with the agreement or not, which seems to be something the Constitution puts squarely in the legislative branch. Yeah, Your Honor, we disagree with that. I mean, the reason… It's not even clear that an extension was required. Out of an abundance of caution… The date… The chair… Extended upon agreement by the tribe to a later date. Correct. And you filed at the later date. So you had to have… Correct. The tribe's agreement. The uncertainty was that the Allottees had challenged the judgment of the Montana Water Court. It was affirmed in the Montana Supreme Court in July of 2015. They then petitioned for certiorari in the United States. I understand that. Right. And that petition was pending as of March 31, 2016. So as they were approaching that deadline, there was a concern that the pending of the petition challenging the Montana Water Court judgment could mean that the judgment was not final, which is the first task that they needed to complete. So the chair and the secretary decided… I have a statute that says if the secretary does not publish a statement of findings no later than March 31, 2016 or extended…  I'm not saying you had a bad reason. Whatever the reason, you had to go forward to a later date for extension. It had to be agreed to by the tribe and the secretary.  Secretary agreed, obviously, for the extension. Right. The tribe had to agree. Now, the question is whether there was a reasonable belief that the chairman could agree to that.  I'm going to finish my sentence. Sorry. Please. All right. And if you look at it as well, it's just an extension of time. We all like that. It seems like something within the executive branch. But if you look at the statute, which attaches extraordinary consequences to the agreement to agree to an extension or not, that is, it is an off-ramp from the whole agreement. Will we have the agreement or not? Will we have the agreement or not? Will we continue with this agreement or not because it's not working for us? That's a decision that the council or legislature had to make, and it's not an executive decision. So this statute attaches such significance to this agreement to an extension. Then how could the secretary reasonably think that the chair alone could decide that when it really is a judgment about whether we still want to have this agreement or not? Because, Your Honor, the Settlement Act provides for a general council vote only for the initial ratification of the compact, which happened in 2011. As of then, the tribe, as the full tribe, had voted to support this settlement. I understand that, but now the question is whether as a matter of tribal law, not the Settlement Act, who has the authority to decide whether to extend the time period. And if extending the time period is actually a judgment about do we want to go forward with this compact, given where we are in 2016, that would be a legislative decision, not an executive one. Your Honor, I believe it's an executive. It was reasonable to conclude it was an executive branch decision here because the Constitution does afford to the tribal chairman the ordinary scope of executive duties. But this is ordinary. This is essentially the extension judgment. It's difficult because we don't think of extensions as having these types of consequences, but if you think of the extension judgment as do we want to go forward with this compact or not? Right. Do we want to unsign or stick with it? That would be a legislative judgment. There was no indication from the legislature or the general counsel as a whole that they wanted to repudiate the settlement. You didn't ask them. That's why they weren't getting to weigh in. Your Honor, the general counsel under the Constitution meets biannually. You can trigger the extraordinary procedures for initiative or referendum. Those procedures take time. There was not even any thought that there was a need for an extension until the allottees filed their petition for certiorari. What date did they file their petition? December, in December 2015. Seven months, or five months, I guess. Three. I mean, March 31 was the deadline. Yeah, you're right. Sorry. So the undertaking of trying to, just as a practical matter, apprise... You said the counsel didn't ordinarily meet between December and March. The general counsel typically meets every two years. The legislature meets quarterly under Article 4, I believe, the second week in January, April. There was a meeting in January. You're right. It was not presented to them at that meeting. I would point out that it was... I'm sorry. You started with, oh, we couldn't get feedback from them. But, of course, they met in January. And we knew that a cert petition had been filed by then, and the federal government is fully aware of the lifecycle of a cert petition and how long it takes. It presumably knew how long it would take for the U.S. to respond to that cert petition. And so you had an opportunity to go to the legislative branch. If we look at this extension decision as a we want, we continue to agree or not with this compact. We look at it as a substantive decision, which the statute seems to imbue it with. There was no reason to believe that the tribe as a whole wanted to repudiate the settlement. It's not anticipating what their answer is. The question is, who do you ask for the extension? And you had the opportunity to ask the legislature. And the nature of this very unusual extension decision is so substantive and goes to the merits, the heart of whether they wish to go forward with this agreement. Right. And you didn't ask. And since then, there has been no indication that the tribe had a problem with the extension. They have met repeatedly afterwards. My question is, who decides about the extension? It might have said, yes. My question is not asking you guess what the legislature would have said if you'd asked. My question is, who gets to decide to agree to the extension or not? Whether it's an executive judgment, just implementing a law, or whether it's a decision about what the law governing us is going to be. And given that Congress put this exploding provision into the Settlement Act, it was very much a decision about whether we're going to go forward with this agreement or not, given the state of things. And so you could have asked the legislature. You didn't. You asked the wrong person. It was reasonable, Your Honor, for the secretary to enter into this agreement with the tribal chairman. What was reasonable about that, given the nature of what the decision was? Because there is reason to believe in the Constitution and the way the executive branch operates in the Crow tribe, as with the ordinary executive functions, that that was a reasonable procedure to enter into that agreement. You're saying it's reasonable, but if it's not viewed at all as just implementing a law, but deciding what the law will be, which is not the chair's decision, then it's not reasonable. But, Your Honor, taking the flip side of it, if they couldn't, I mean, you assume that it all could have been presented to the legislature. I don't know whether it could have been by the second week in. I don't have the burden of showing reasonableness here. You do. All right. And you've made no argument whatsoever in the briefs that it was unreasonable to do so, given that the legislature met in January. You've given no, you can make stuff up now, but there's nothing in the record that shows that this was a reasonable judgment not to take this question to the legislature. Right. And, Your Honor, the only point that the Elites rely on is the resolution in 2012, which was a protest, which did not even rescind the waivers that have been signed in 2012 and did not say that the other agreements under the Settlement Act decision for the legislature. And I'm telling you, when I look at the settlement agreement, this exploding device in the middle of the statute makes the extension agreement very different than an extension agreement. That was intended to hold everyone's feet to the fire, but there is no indication. If they don't comply with the timelines, the tribe can get out of it. The tribe can say, we don't want to go forward. If you don't meet the timelines, for the very reasons that have been argued to us today. But the tribe, the acts, the tasks that were the tribe's responsibility, they did complete. It was on track. And the tribe that had voted altogether in 2011, there was no indication that they did not want the settlement to go. They did not want the settlement to disappear. They wanted to proceed with the settlement again. I'm not sure why you've shifted to focusing on whether it was reasonable here, because isn't it a question of law, whether the tribal chairman has this authority? So I'm not sure where the reasonableness. So, like, you know, you're saying it's reasonable for the secretary to think that the tribal chairman had the authority, right? But isn't this just a pure question of law under the Crow Constitution and other Crow laws, whether he had that authority? I'm not sure where the reasonableness is. The secretary has the duty to maintain a government to government relationship with 574 tribes, which have very different governance structures. And it's the policy of the United States, the tribal self-determination policy to abide by tribal law wherever possible. But federal law controls and federal law, it's a policy of federal law to defer to tribal law. And in this case, the secretary reasonably so it is a reasonableness standard in determining whether to follow tribal law, how to follow tribal law. Her primary duty was to implement the settlement act that Congress had passed with the approval of the tribe and to keep that in effect by agreeing to a modest extension. In that case, I don't the record doesn't reveal the background story of who talked to who about precisely how to get this done. But the tribal chairman, it was reasonable for her to accept his representation that he had authority based on the Crow Constitution. And we cite various provisions. Your Honor reviewed the Constitution for a short term extension. If the legislature disagreed, if the general counsel disagreed, they could weigh in later. The tribal court could have disagreed if somebody timely had brought it to their attention. But the alternative was because of a possible delay caused by a cert petition that the settlement act that everyone had worked for for decades would simply disappear. There's no indication that the settlement act should be interpreted to provide that result. And if there were a clear tribal law, then there would be a better argument. But there's not clear tribal law. The secretary all the time in acting for tribes. That's why cases have adopted it. You don't have to get it right. You have to make a reasonable determination because you can't always get it right. And the decision was reasonable. We maintained. Do my colleagues have any more questions? Finish your sentence and wrap up. Your Honor, we believe that the district court carefully reviewed the complaint, carefully reviewed the opposition to the motion to dismiss that the thrust of the claims are that the allies do not. Like the settlement, they wish there had been a different settlement. They maintain their implementation failures. There are remedies that they likely could obtain to redress any of those implementation failures, but that they have not made out a claim that would result in the invalidation of the settlement act. And we ask that you affirm. Thank you. So, instead, we'll give you two minutes. Thank you, your honors. Obviously, you've honed in on the key issue. One of the key issues in terms of the expiration of the deadline, and we agree that it is a legal, a hard and fast legal requirement of the act that if the publication can't be made by that March 31st, 2016, the act is automatically repealed. About the issues of the approval and the engagement of the legislature or the general counsel, there's evidence and maybe the resolution is best put in this light. Also, the legislature was highly engaged in this and didn't like the way things were unfolded as demonstrated by that resolution. So, they were highly engaged in this and inserting themselves in the process. Also, with respect to the ratification. They didn't do anything in 2016. Pardon? They didn't do anything in 2016. They didn't do anything in 2016? The legislature didn't do anything in response to the extension agreement in 2016. They met in January. I assume they met again sometime between April, May, June. So, they had another opportunity after the extension agreement to react to the chairman's decision to extend time, but didn't do anything. That may be correct. There's another point to emphasize here, however, that to the extent we're not clear about different aspects of the tribal legislative process and when they meet. Because not all of this is clear. The government is mentioning times of the year that they meet, but there's also evidence that we've submitted and alleged that when it came to the water compact, they did things in a different order and they put things forward in an emergency basis in other contexts. What do we take from the fact that the legislature would have proceeded to normally or in an emergency basis to respond to the extension decision by the chairman in 2016 and didn't? Well, I would suggest that on that point, it's a different point. Not within the scope of our claims. To the extent that that would be important, it's another reason for the case to be remanded for further factual development. But based on what has been alleged, I think it's been clearly alleged. And that's what we have to go by is the factual basis that is alleged that the tribal chairman didn't have that unilateral authority. Can I just ask you a question? Did the authorities go to the tribal courts to get a ruling about the tribal chairman's authority? Because that would give us a clear answer as to, I mean, did they avail themselves of the tribal courts to challenge the chairman's action? The tribal court wouldn't have been an arena that would have jurisdiction for this kind of a decision about the interior's responsibility for implementing the compact. I mean, it would be a challenge to the tribal chairman's authority. The same way someone would come to a federal court and say, you know, the president exceeded his authority under the Constitution. I don't know that we've identified that there would be a cause of action or a claim for relief to do that under the Constitution. That isn't part of the case. If to the extent it was relevant, again, that's something that should be put forth below so that there could be further factual development of the case. I don't think that is their burden to do that in order to grant the relief that's requested with respect to the compact and the secretary's responsibilities. One other thing I wanted to point out with respect to the timeline of doing things. The legislature obviously showed itself that it could react, and it did react. The tribe's general counsel, which we also suggest should have approved this, showed it also could react very quickly. You addressed the issue with the government about the timeframe, and they had plenty of time to anticipate this deadline coming and know the hard and fast consequences of the deadline passing. It took less than one month from the ratification procedures that they implemented for the vote of the full general counsel on the water compact. It took them less than a month to draft those procedures and pass them in the legislature to the day of the vote for the initial referendum. So there's plenty of time. The tribe was very nimble, unlike maybe some other places, to move forward on this. So that shouldn't have been an impediment to the government. Over your rebuttal. My colleagues don't have any further questions. Thank you very much to both counsel.
judges: Millett; Rao; Rogers